UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHELIA M., <br><br> Plaintiff, <br><br> v. <br><br> ANDREW M. SAUL, <br> Commissioner of Social Security, <br><br> Defendant. | Case No. 20 C 664 <br><br> Magistrate Judge Sunil R. Harjani |

## MEMORANDUM OPINION AND ORDER

Plaintiff Shelia M.[1] seeks judicial review of the final decision of the Commissioner of Social Security finding her ineligible for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, Shelia's motion [18] is denied, the Commissioner's motion [25] is granted, and the ALJ's decision is affirmed.

## BACKGROUND

Shelia, a former Certified Nursing Assistant, alleges that she became disabled in October 2017, at the age of 52. (R. 119, 259). According to Shelia, she was working as a medical assistant when standing or walking increased her pain to the point that she had to stop working. *Id.* at 258, 259. In her disability application, Shelia listed diabetic gastroparesis, diabetes, asthma, bronchitis, morbid obesity, sleep apnea, fibromyalgia, bilateral carpal tunnel, arthritis, and hypertension as the physical or mental conditions that limited her ability to work. *Id.* at 257. Shelia's medical record shows that her treatment for those ailments has included office visits,

---

[1] Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff by her first name and the first initial of her last name or alternatively, by first name.

consultations with specialists, the obtaining of medical imaging scans, epidural steroid injections, and prescription medications, such as gabapentin, hydrocodone, duloxetine, amlodipine, and losartan. *See, e.g.*, *id.* at 260, 362, 613, 879, 890.

Shelia filed for a period of disability and disability insurance benefits on December 8, 2017, alleging disability beginning October 11, 2017. (R. 222). Shelia's claim was initially denied on May 8, 2018, and upon reconsideration on July 19, 2018. *Id.* at 131, 145. Upon Shelia's written request for a hearing, she appeared and testified at a hearing held on March 29, 2019 before ALJ Kathleen Kadlec. *Id.* at 81-118. At the hearing, the ALJ heard testimony from Shelia and a vocational expert, Sarah Gibson. *Id.*

On July 10, 2019, the ALJ issued a decision denying Shelia's DIB claim. (R. 20-30). At the outset, the ALJ determined that Shelia was last insured as of September 30, 2022. *Id.* at 22.[2] Following the five-step sequential analysis, the ALJ found that Shelia had not engaged in substantial gainful activity since October 11, 2017, the alleged onset date (step 1), and that she suffered from the severe impairments of carpal tunnel syndrome, fibromyalgia, and degenerative joint disease of the ankle, right hip, and lumbar spine (step 2). *Id.* at 22-23. The ALJ then determined that Shelia's impairments did not meet or equal the severity of a list impairment (step 3). *Id.* at 23.

The ALJ next concluded that Shelia retained the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b), except:

> she can occasionally use foot controls bilaterally, frequently use hand controls bilaterally, reach overhead on the left on a frequent basis, but occasional overhead reaching on the right. She can reach in all other directions bilaterally frequently. She can handle, finger, and feel bilaterally frequently and never climb ladders, ropes and scaffolds. She can occasionally climb ramps and stairs as well as

---

[2] To be eligible for DIB, a claimant must show that she was disabled as of her date last insured. *See Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012).

2

> occasionally balance, stoop, kneel, crouch and crawl. She can face no exposure to unprotected heights, only occasional exposure to moving mechanical parts, operation of a motor vehicle and vibration. She is limited to simple routine tasks with simple work related decisions.

(R. 23-24). The ALJ next determined, given this RFC, that Shelia was not capable of performing her past relevant work as a medical assistant or nurse assistant (step 4). *Id.* at 28-29. The ALJ then found that there were jobs that exist in significant numbers in the national economy that Shelia could perform (step 5). *Id.* at 29. Specifically, the ALJ found that Shelia could perform the jobs of rental clerk, information clerk, and counter clerk. *Id.* at 29-30. Because of this determination, the ALJ found that Shelia was not disabled. *Id*. at 30. The Appeals Council denied Shelia's request for review on December 19, 2019, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1-3; *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018).

## **DISCUSSION**

Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine disability within the meaning of the Social Security Act, the ALJ conducts a sequential five-step inquiry, asking: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the claimant's impairment meet or equal an impairment specifically listed in the regulations? (4) Is the claimant unable to perform a former occupation? and (5) Is the claimant unable to perform any other work in the national economy? *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on

steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski*, 760 F.2d at 162 n.2.

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In reviewing an ALJ's decision, the Court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusions. *See Steele v. Barnhart*, 290 F.3d 936, 938, 941 (7th Cir. 2002) (internal citation and quotations omitted); *see also Fisher v. Berryhill*, 760 Fed. Appx. 471, 476 (7th Cir. 2019) (explaining that the "substantial evidence" standard requires the building of "a logical and accurate bridge between the evidence and conclusion"). Moreover, when the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Shelia raises two issues in support of her request for reversal: (1) the ALJ failed to properly analyze Shelia's deficit in concentration; and (2) the ALJ should have sought an updated medical expert review of the evidence that post-dated the state agency physicians' reviews. *See* Doc. [18]. The Court affirms the ALJ's decision because her findings are supported by substantial evidence.

As the Supreme Court recently stated, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is 'more than a mere scintilla.'" *Biestek*, 139 S. Ct. at 1154. Here, the ALJ has sufficiently supported her conclusion with evidence, which evidence is definitely more than a mere scintilla, the Court can follow the ALJ's analysis in conducting a meaningful review, and a reasonable mind could accept the conclusion reached. Thus, this Court cannot and does not reweigh the evidence or substitute its own judgment for that of the ALJ. Accordingly, for the reasons stated below, remand is not appropriate.

**A.** **Concentration Deficit**

Shelia contends that the ALJ did not properly analyze her deficit in concentration. Doc. [18]. Specifically, she maintains that the ALJ should have performed a function-by-function analysis of Shelia's deficiency in concentration, and that a restriction to unskilled work does not adequately accommodate a deficiency in concentration. *Id.* at 10-12. The Court addresses both of Shelia's concentration arguments in turn.

**1. Function-by-Function Analysis under SSR 96-8p**

According to Shelia, SSR 96-8p required the ALJ to analyze Shelia's ability to perform the functions contained in the broad category relating to her ability to concentrate, persist, or maintain pace. Doc. [18] at 10-11. In other words, because the ALJ conceded that Shelia had a deficit in concentration, the ALJ should have determined Plaintiff's capacity "for initiating and performing a task that she understood and knew how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during

5

the day." *Id.* at 11 (citing POMS DI 34001.032 Mental Disorders). Because the ALJ did not conduct that function-by-function analysis, Shelia argues that the RFC lacks substantial support in the record.

SSR 96-8P is a Social Security Ruling, titled "Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims." SSR 96-8P, 1996 WL 374184 (S.S.A. July 2, 1996). The ruling provides, in important part, that "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." *Id.* at *1. The ruling also states that the RFC assessment "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945." *Id.* With respect to mental limitations specifically, the ruling discusses a "psychiatric review technique," described in 20 CFR 404.1520a and 416.920a, which "requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the 'paragraph B' and 'paragraph C' criteria of the adult mental disorders listings." *Id.*

The correlating regulation on the evaluation of mental impairments, 20 C.F.R. § 404.1520a, instructs that an ALJ "must first evaluate [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment." *Id*. § 404.1520a(b)(1). If the ALJ determines that the claimant has a medically determinable mental impairment, the ALJ "must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of this section[.]" *Id*. § 404.1520a(b)(2). Paragraph C, in turn, states that the agency has "identified four broad functional areas in which [the agency] will rate the degree of [the claimant's] functional limitation:

6

Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id*. § 404.1520a(c)(3). Put simply, "[i]f the claimant has a medically determinable mental impairment, then the ALJ must document that finding and rate the degree of functional limitation in four broad areas," which includes the category of "concentration, persistence, or pace." *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008) (citing 20 C.F.R. § 404.1520a(c)(3)).

The trouble then with Shelia's argument is that the ALJ never determined that Shelia had a medically determinable mental impairment, so the regulations did not require the ALJ to assess the degree of functional limitation in the four "B criteria" areas. *Craft*, 539 F.3d at 674. Rather, the ALJ found that Shelia had the severe impairments of carpal tunnel syndrome, fibromyalgia, and degenerative joint disease of the ankle, right hip, and lumbar spine, as well as the non-severe impairments of hypertension, obstructive sleep apnea, and diabetes with neuropathy. (R. 23).

That is not to say that the ALJ's decision omitted discussion on Shelia's ability to concentrate altogether. The ALJ acknowledged (but did not fully credit) Shelia's claims that she struggled with concentration,[3] and determined that the combined effects of Shelia's impairments included the "distracting effect of her pain and side effects from medications[.]" *Id.* at 24, 25, 27. The ALJ even accommodated that "distracting effect" by crafting an RFC with no exposure to unprotected heights; only occasional exposure to moving mechanical parts, operation of a motor vehicle and vibration; and only simple routine tasks with simple work related decisions. *Id.* at 27. Yet acknowledging Shelia's subjective symptom allegations and accommodating the distracting

---

[3] The ALJ found Shelia's subjective symptom allegations largely inconsistent with the record: "As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent due to multiple factors." (R. 25). The ALJ's reasons for discounting Shelia's testimony included her "fairly routine and conservative" course of treatment, overall normal physical exams, and Shelia's non-compliance with her CPAP machine. *Id.*

7

effect of pain and side effects from medication is not the same as finding that Shelia had a medically determinable mental impairment, such as depression, anxiety, or bipolar disorder. The ALJ's discussion of concentration-related issues, while reminiscent of a Paragraph B discussion regarding concentration, persistence, or pace, does not require the ALJ to rate the degree of functional limitation according to the four broad functional areas. That requirement is only triggered by the finding of a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)-(c).

Shelia further argues that even if the ALJ had conducted the requisite function-by-function analysis, the ALJ was not qualified to do so because the ALJ's finding about Shelia's mental health limitations had to be supported by the opinion of a medical expert. Doc. [18] at 11-12. In support, Shelia cites *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018) and *Brown v. Saul*, 799 Fed. Appx. 915, 920 (7th Cir. 2020). *Id.* at 12. Neither case stands for the proposition that Shelia espouses. In *Moreno*, the Seventh Circuit held that the ALJ erred in evaluating mental health evidence by relying on an old mental health assessment conducted years earlier by the state agency physicians where new evidence revealed "significant and new developments in [the claimant's] mental health that could have affected [the state agency physicians'] assessment." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), *as amended on reh'g* (Apr. 13, 2018). The *Moreno* Court also faulted the ALJ for basing the RFC, in part, on the ALJ's lay conclusion that the new records showed improvement, an assessment that the Seventh Circuit found "was not justified under the circumstances of [the] case." *Id.* at 729. In *Brown*, the ALJ erred by not properly grounding on a medical opinion her determination that new treatment notes reflected a reemergence rather than a continuation of the claimant's tremors. *Brown v. Saul*, 799 F. App'x 915, 920 (7th Cir. 2020). Thus, neither case holds that the ALJ had to have a medical expert

conduct the Paragraph B analysis, and the Court need not delve further into the question of whether there is such a requirement, as the ALJ was not required to conduct the Paragraph B analysis in this case. The ALJ was qualified (and obligated), per the regulations, to initially determine whether Shelia had a medically determinable mental impairment. 20 C.F.R. § 404.1520a. The ALJ's decision reflects that the ALJ fulfilled that role and found that Shelia only suffered from medically determinable physical impairments.[4] Shelia's "not qualified" argument therefore misses the mark.

2. **Reduction to Simple Routine Tasks with Simple Work Related Decisions**

Shelia's second concern with the ALJ's handling of her purported concentration deficit is the ALJ's RFC accommodation of "only simple routine tasks with only simple work related decisions." Doc. [18] at 12 (citing (R. 27)). Shelia reasons that a limitation in concentration cannot be accounted for by a limitation in skill. *Id.*

Both "'the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record,' including even moderate limitations in concentration, persistence, or pace." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019). "Though particular words need not be incanted, we cannot look at the *absence* of the phrase 'moderate difficulties with concentration, persistence, and pace' and feel confident this limitation was properly incorporated in the RFC and in the hypothetical question." *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019) (emphasis in original). Generally, "employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those

---

[4] The ALJ's determination that Shelia did not suffer from a medically determinable mental impairment was supported by the opinion of the initial reviewing state agency physician, who wrote: "The claimant didn't allege any mental impairments. She is going [through] the process of having bariatric surgery, which is a 6 month process of evaluations. There were no signs of depression at Internist CE on 3/31/18. Claimant has impairments [that] are related to obesity. The claimant also stated that due to sleep apnea, concentration could be impaired sometimes. There is no diagnosis of depression or anxiety. Therefore, a mental impairment can be ruled out." (R. 123).

9

positions that present significant problems of concentration, persistence and pace, and thus, alone, are insufficient to present the claimant's limitations in this area." *Id*. (internal quotation marks and citations omitted). This is because the terms "simple, routine, and repetitive tasks" refer to "unskilled work," which the regulations define as work that can be learned by demonstration in less than 30 days, but "the speed at which work can be learned is unrelated to whether a person with mental impairments—i.e., difficulties maintaining concentration, persistence, or pace—can perform such work." *Lanigan v. Berryhill*, 865 F.3d 558, 565-66 (7th Cir. 2017) (citations omitted); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) (citations omitted) ("The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity.").

Here, as discussed above, the ALJ did not determine that Shelia had a medically determinable mental impairment, so the ALJ did not assess whether Shelia had a mild, moderate, or marked limitation in concentration, persistence or pace. As such, the ALJ had no obligation to present a hypothetical to the vocational expert that expressed a limitation in concentration, persistence, or pace. The ALJ likewise had no obligation to include a restriction in the RFC that accommodated a limitation in concentration, persistence, or pace. Although the ALJ's "simple routine tasks" accommodation resembles concentration, persistence, or pace RFC limitations that have been rejected by the Seventh Circuit, *see, e.g.*, *Winsted*, 923 F.3d at 476, the RFC accommodation at Step Three does not mean that the ALJ found at Step Two that Shelia had a limitation in concentration, persistence, or pace. The ALJ's decision proves that there was no such finding. (*See* R. 23).

At any rate, the ALJ's purported error in Shelia's mental RFC assessment would be harmless because Shelia does not explain what further limitations would be appropriate. In

10

*Jozefyk v. Berryhill*, the Seventh Circuit held that any mental RFC assessment flaw by the ALJ in that case was harmless, in part, because it was "unclear what kinds of work restrictions might address [the claimant's] limitations in concentration, persistence, or pace," due to the fact that the claimant had not hypothesized any. 923 F.3d at 498. The *Jozefyk* court further supported its harmless error analysis with the observation that the claimant did not cite any evidence showing that his mental deficits kept him from performing work as confined by the ALJ's mental RFC. *Id*. So too here, Shelia has not explained what additional limitations should have been imposed. Shelia points out generally that her treating physician opined that Shelia would be off task more than 25% of the time, Doc. [18] at 10, but the ALJ discounted the treating physician's opinion, and Shelia does not attack the ALJ's weighing of the opinion. (R. 28). The rest of the record, moreover, does not support the 25% off-task accommodation or call for further mental health limitations in the RFC. Any error in the ALJ's mental RFC analysis was thus harmless. *See also Saunders v. Saul*, 777 F. App'x 821, 825 (7th Cir. 2019) (upholding RFC where claimant suggested no "better way to capture the idea behind limitations in concentration, persistence, and pace and apply those problems to job requirements"); *Dudley v. Berryhill*, 773 F. App'x 838, 842 (7th Cir. 2019) ("Critically, Dudley did not identify any limitations that the ALJ omitted and should have included in the hypothetical question.").

**B.     Need for Updated Medical Opinion**

Shelia next avers that the ALJ should have sought an updated medical expert opinion because the evidence submitted after the last state agency review in July 2018 "changed the picture too much" for the ALJ to rely on the state agency physicians' findings. Doc. [18] at 14.

It is common for there to be a lag between the state agency physicians' reviews and the ALJ's decision, so the fact that new medical records came in after the state agency physicians conducted their reviews, is not, by itself, problematic. *See Keys v. Berryhill*, 679 F. App'x 477,

481 (7th Cir. 2017) (citing *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004)) ("If an ALJ were required to update the record any time a claimant continued to receive treatment, a case might never end."). Rather, an outdated state agency problem occurs if there exists "later evidence containing new, significant medical diagnoses [that] reasonably could have changed the reviewing physician's opinion." *Moreno*, 882 F.3d at 728; *see also Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (remanding where state agency physician did not have access to later medical evidence containing "significant, new, and potentially decisive findings" that could "reasonably change the reviewing physician's opinion").

Courts have found evidence following a state agency physician's review to be potentially decisive in situations where it reveals a new condition or reflects a severe worsening of a condition. For instance in *Stage*, the Seventh Circuit held that a treating physician's "report, which diagnosed significant hip deformity, a restricted range of motion, and the need for a total left hip replacement, changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician and by evaluating himself the significance of [the treating physician's] report." *Stage*, 812 F.3d at 1125. Likewise, in *Lambert*, new evidence of failed surgical attempts to treat the claimant's pain and an opinion by the treating neurosurgeon that the claimant was no longer capable of even sedentary work was found to be new and significant evidence that reasonably could have changed the state agency physician's opinion. *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018). *See also Kemplen v. Saul*, No. 20-1651, 2021 WL 345751 (7th Cir. Feb. 2, 2021) (ALJ erred in not soliciting updated medical opinion interpreting new x-rays showing claimant was experiencing osteoarthritic changes in her elbow and her left hand, along with soft-tissue swelling in her hand and fractured left pinky finger); *Kevin George K. v. Berryhill*, No. 18 CV 3639, 2019 WL 2122987, at *7 (N.D. Ill. May 15, 2019) (new evidence

showing, for the first time, that claimant suffered from seizures, as well as the treatment, monitoring, and testing for various syncopal episodes comprised significant and potentially decisive evidence that could have reasonably changed the reviewing physician's opinion).

By contrast, new evidence showing only mild changes in a claimant's condition, has not been found to be potentially decisive. In *Keys*, the Seventh Circuit found no error in the ALJ's reliance on the state agency physicians' opinions where the new MRIs showed only "mild" changes and where the claimant provided no "evidence that the reports would have changed the doctors' opinions." *Keys*, 679 Fed. Appx. at 480-81. The *Bond* case provides another example of later findings not rising to the level of new, significant, and potentially decisive evidence that reasonably could have changed the state agency physicians' opinions. There, the court found that the claimant failed to show how a subsequent CT scan revealing only mild degenerative changes would have altered the opinions of the state agency consultants. *Bond v. Berryhill*, No. 16 C 2018, 2017 WL 1398656, at *3 (N.D. Ill. Apr. 18, 2017). Important to both the *Keys* and *Bond* decisions was the claimant's failure to demonstrate how the new evidence could have impacted the state agency physicians' opinions. *See Keys*, 679 Fed. Appx. at 481; *Bond*, 2017 WL 1398656, at *3. *See also Spaulding v. Berryhill*, No. 16-CV-6298, 2017 WL 3922878, at *9 (N.D. Ill. Sept. 7, 2017) ("Claimant did not provide any evidence that her treatment records from the RIC would have caused the state agency medical consultants to change their determination that Claimant could perform light work."); *Ray v. Berryhill*, No. 16 CV 4376, 2017 WL 1397552, at *7 (N.D. Ill. Apr. 19, 2017) (finding no error in relying on state agency physicians' opinions where claimant "ha[d] not shown any prejudice from the failure to obtain additional opinions or that the ALJ otherwise failed in her duty to develop a full and complete record"); *Victoria A. v. Saul*, No. 319CV00216RLYMPB, 2020 WL 3950534, at *4 (S.D. Ind. June 19, 2020), *report and*

*recommendation adopted*, No. 319CV00216RLYMPB, 2020 WL 3893972 (S.D. Ind. July 10, 2020) ("Plaintiff has not demonstrated how these new records would impact the state agency physicians' opinions or the conclusions the ALJ drew at step two regarding Plaintiff's major depressive disorder and generalized anxiety disorder.").

In this case, Shelia claims that the state agency physicians' review, last conducted in July 2018, missed important physical therapy records, as well as later records documenting Shelia's "new hip problem." Doc. [18] at 14. Shelia also directs the Court to her treating physician's opinion and a smattering of physical examination findings. For the reasons discussed below, the Court finds that none of Shelia's highlighted evidence would have "changed the picture so much" that an updated medical review was needed in this case. *Stage*, 812 F.3d at 1125.

1.  **Physical Therapy Records**

After a car accident in February 2018, Shelia was referred for physical therapy. (R. 962). She presented at her initial physical therapy appointment with right ankle pain and swelling, as well as limited right ankle range of motion, strength, and single leg balance. *Id.* Shelia had eight physical therapy sessions and was discharged in May 2018, after partially meeting only the last of her six long term goals, which consisted of: (1) increasing ankle range of motion by 5-10 degrees in all directions to don socks and shoes without difficulty; (2) increase ankle strength to 4+/5 to climb stairs reciprocally; (3) increase single leg strength to at least ten seconds to complete tub transfers safely; (4) decrease right ankle edema by at least one centimeter to stand for ten minutes to make lunch; (5) increase walking speed to 0.87 meters per second to increase community ambulation; and (6) increase lower extremity functional scale to 35/80 to grocery shop with less than 4/10 right ankle pain. *Id.* at 964-65. At the time of discharge, Shelia continued to demonstrate swelling, decreased lower extremity strength, decreased right ankle range of motion, and decreased

gait speed with an antalgic gait pattern. *Id.* at 965. The physical therapist's notes near the time of Shelia's discharge indicate that Shelia moved slowly through exercises but was able to perform all of them. *Id.* at 962. In addition, Shelia reported feeling pain at the 4/10 level in her ankle after a session and demonstrated a decreased antalgic gait in a session near the time of her discharge. *Id.* In the session immediately prior to discharge, the physical therapist advised Shelia to look into the community for a pool for continued gentle strengthening and managing weight in order to decrease pain and improve overall function. *Id.* Shelia was then discharged with an updated home exercise program. *Id.* at 961. Her rehabilitation medical diagnosis was documented as an ankle sprain. *Id.* at 963.

Shelia claims that the state agency physicians were not aware of the physical therapy records because the documents were submitted after the physicians' July 2018 review. Doc. [18] at 13. Assuming that is true, the state agency physician who reviewed Shelia's record in July 2018 was nevertheless aware of Shelia's ankle impairment. In support of the reconsideration of her disability application, Shelia specifically informed the agency about her car accident and stated she had trauma to her right ankle. (R. 133). The reviewing state agency physician further considered the x-ray of her ankle from April 2018 that preceded Shelia's physical therapy and discussed it in his RFC analysis, writing: "4/12/18-[right] ankle xray (pain)-[degenerative joint disease], soft tissue swelling." *Id.* at 141. The findings from that x-ray were listed as "moderate soft tissue swelling about the ankle . . . moderate size dorsal and prominent plantar calcaneal enthesophytes . . . degenerative changes of tarsometatarsal and tarsometatarsal joints . . . [and] no evidence of acute fracture, dislocation or destructive lesion." *Id.* at 721. Thus, the physical therapy records documenting Shelia's sprained ankle, an injury that the latest state agency review considered and analyzed as part of the reconsideration RFC, did not "change[] the picture so much

that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician and by evaluating [herself] the significance of [the records]." *Stage*, 812 F.3d at 1125.

### 2. Dr. John's Records

In September 2018, Shelia presented to Dr. Sunil John for a rheumatology consultation. (R. 890). Her musculoskeletal physical exam showed multiple tender spots diffusely, bilateral shoulder joints with tenderness, no synovitis or tenderness in the elbows, no tenderness or synovitis in the hands, thenar atrophy and positive Tinel sign in the hands, no effusion or tenderness in the knees, chronic ankle and knee puffiness, and no metatarsophalangeal joint tenderness. *Id.* at 893. For the neurologic part of the exam, Dr. John noted that Shelia had "normal gait, normal bilateral hand grip, muscle strength and tone were normal, no muscle atrophy and no tremor was seen." *Id.* In Dr. John's plan for Shelia, he started Shelia on some new medications, renewed some other medications, and concluded that Shelia "has fibromyalgia in addition to her other medical problems including degenerative disc disease, anxiety, depression, morbid obesity, carpal tunnel syndrome, thyroid nodules, obstructive sleep apnea, type 2 diabetes, hypertension, and hyperlipidemia." *Id.* at 895.

This September 2018 record, like the physical therapy records, does not encompass significant, new, and potentially decisive findings that could have reasonably changed the state agency physicians' opinions. In the latest state agency physician review, Dr. Reynaldo Gotanco concluded, consistent with Dr. John's opinion, that Shelia had the severe impairments of fibromyalgia, carpal tunnel syndrome, diabetes, and peripheral neuropathy. *Id.* at 137-38. In his RFC analysis, Dr. Gotanco discussed Shelia's diabetes, asthma, lower extremity swelling, degenerative joint disease, sleep apnea, obesity, fibromyalgia, arthritis, carpal tunnel syndrome, and hypertension. *Id.* at 141-42. And while Dr. Gotanco did not specifically discuss Shelia's

16

degenerative disc disease, thyroid nodules, or hyperlipidemia, those problems were not new, and the state agency physicians were provided with medical records documenting those ailments. *Id.* at 134-36, 150, 364, 380, 478-49. As for the rheumatologist's diagnoses of anxiety and depression, the record lacks support for those diagnoses, [5] and it is not clear how Dr. John came to the conclusion that Shelia had those mental health impairments. The Court therefore finds that, by and large, the rheumatology examination from September 2018 presented gradual changes of Shelia's previously known conditions, not a significant deterioration or presentation of new medical conditions that changed the picture so much that an updated medical review was needed.

### 3. Dr. Assefa's Records

Dr. Girma Assefa, Shelia's treating physician, examined her in October 2018. (R. 878). Shelia's musculoskeletal exam revealed normal appearance in the cervical spine and shoulder with tenderness in the right paraspinal, hand joints, and wrists. *Id.* Shelia presented with full range of motion, except for some restricted right shoulder extension and limited flexion and extension of the lumbosacral spine. *Id.* Dr. Assefa noted that Shelia was experiencing muscle spasms in the lumbosacral spine and a diabetic neuropathy. *Id.* In connection with Dr. Assefa's physical examination of Shelia, she completed a disability form for her. *Id.* at 879. In that RFC form, Dr. Assefa opined, among other things, that Shelia could sit for about two hours a day and stand/walk for less than two hours a day. *Id.* at 777. The ALJ did not need to seek an updated medical opinion.

---

[5] For the most part, Shelia's examinations showed no signs of depression or anxiety. (*See, e.g.,* 545, 664, 684-85, 749, 776). By the Court's review, only one treatment record (other than Dr. John's) suggests Shelia ever experienced symptoms of depression or anxiety. In October 2018, Shelia underwent a pre-surgical bariatric psychological evaluation. (R. 789). The licensed clinical psychologist conducting Shelia's examination found that Sheila's answers indicated that she was not experiencing significant symptoms of depression and that she was experiencing only minimal symptoms of anxiety. *Id.* at 792. Dr. Newman ultimately concluded, however, that "[t]here was no indication of significant depression, anxiety, psychosis, or suicidal ideation." *Id.* at 793. On the whole, the medical record does not support Dr. John's depression and anxiety diagnoses.

17

First, Shelia's demonstration of muscle spasms and diabetic neuropathy is not new or potentially decisive. Both state agency physicians discussed Shelia's neuropathy, and the state agency physicians received the pain clinic records that documented the treatment of Shelia's lumbar muscle spasms. *Id.* at 134-36, 138, 150, 356, 362.

Second, the ALJ had previously determined that the treating physician's opinion was "largely unpersuasive" and "not consistent with his own examination findings." (R. 28). *See Bruce P. v. Saul*, No. 18 CV 7478, 2020 WL 7042888, at *7 n.7 (N.D. Ill. Dec. 1, 2020) (rejecting argument that ALJ erred by failing to submit treating physician's opinion postdating the state agency physicians' review to medical expert due to important distinction between objective medical evidence and subjective medical opinion evidence). Sheila has not challenged the ALJ's weighing of the treating physician's opinion, and thus the Court accepts the ALJ's finding. As a result, the ALJ need not have sought an updated medical review based on a treating physician that the Court had previously found not credible.

In February 2019, Shelia presented to Dr. Assefa in connection with her preparation for bariatric surgery. (R. 831). Shelia complained of right hip pain and presented with decreased range of motion and tenderness in her right hip. *Id.* at 831, 832. The rest of Shelia's physical exam, including her gait, were noted as normal. *Id.* at 832-33. In the diagnoses list associated with the visit, Dr. Assefa included "[p]rimary osteoarthritis in right hip." *Id.* at 834. In Dr. Assefa's plan, she ordered a lab test, referred Shelia to orthopedics, and ordered an x-ray of Shelia's right hip. *Id.* at 834. The findings of that x-ray showed "[m]ild degenerative changes of right hip" with "[n]o definitive acute osseous abnormality of visualized right hip [ ] otherwise seen." *Id.* at 839. The x-ray additionally displayed "[d]egenerative changes of partially included lower lumbar spine," and recommended follow up "as clinically warranted." *Id.* While the February 2019 treatment records

18

include one new diagnosis, that of primary osteoarthritis in the right hip, the records otherwise illustrate gradual changes of ailments already known to the state agency physicians. For instance, Shelia began reporting right hip pain as early as March 2017 and continued to do so thereafter. *See, e.g.*, *id.* at 356, 362, 366. The state agency physicians had access to records documenting her hip pain as part of their review. *Id.* at 134-36, 150. The state agency physicians were additionally provided with pain clinic treatment records that documented Shelia's lumbar spine osteoarthritis, an ailment diagnosed as early as August 2016. *Id.* at 134-36, 150, 356. As a result, the February 2019 treatment record and x-ray do not contain new and significant diagnoses that reasonably could have changed the state agency physicians' opinions. Like the claimant in *Keys*, Shelia has not provided any evidence that the February 2019 treatment records, particularly the x-ray that documented only mild changes in her spine and hip, "would have changed the doctor's opinions." *Keys*, 679 Fed. Appx. at 480-81.[6]

In sum, the medical records postdating the state agency physicians' review did not "contain[] significant, new, and potentially decisive findings" that reasonably could have changed the state agency physicians' opinions. *Stage*, 812 F.3d at 1125. Similar to *Keys* and *Bond*, the records emphasized by Shelia show only mild and gradual changes to Shelia's spine, ankle, and hip problems, issues that were documented at some level in the records provided to the state agency physicians. Shelia has, moreover, failed to show how these records would have changed the state agency physicians' opinions. *Keys*, 679 Fed. Appx. 477, 480-81; *Bond*, 2017 WL 1398656, at *3. The ALJ weighed those opinions, as well as the physical therapy records and post-July 2018 treatment records highlighted by Shelia, and agreed that Shelia could perform light work. *Id.* at 26,

---

[6] Contrary to Shelia's fleeting claim that an ALJ is not capable of determining the effect of Shelia's combination of impairments, *see* Doc. [18] at 14 (citing *Brown*, 799 Fed. Appx. at 920), it is the ALJ's duty to do so. *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003). Furthermore, Shelia points to no problematic lay conclusions drawn by the ALJ here that would make this case like *Brown*.

27, 28. It is not for this Court to "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, No. 20-1753, --- F.3d ----, 2021 WL 1589329, at *5 (7th Cir. Apr. 23, 2021) (citing *Burmester*, 920 F.3d at 510).

Here, the low threshold for substantial evidence was met, as evidenced by the ALJ's development of the record and analysis of Shelia's treatment records, along with the supporting opinions of the state agency physicians. Among other things, the ALJ based her decision that Shelia could perform light work (with postural, manipulative, and environmental limitations) on the ALJ's weighing of medical opinions, the ALJ's finding that Shelia's physical exams were largely normal, and the ALJ's conclusion that there were inconsistencies between Shelia's subjective symptom allegations and the medical record. (R. 23-27). Because a "reasonable mind might accept" the ALJ's cited evidence in this case as "adequate to support" her light RFC conclusion, *Gedatus*, 2021 WL 1589329, at *5 (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)), the ALJ's decision is supported by substantial evidence.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion [25] is granted, and the ALJ's decision is affirmed.

**SO ORDERED.**

Dated: May 5, 2021

Sunil R. Harjani
United States Magistrate Judge